UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **MURPHY OIL USA INC** | **CIVIL ACTION** |
| **VERSUS** | **NO: 12-2756** |
| **UNITED STATES OF AMERICA, ET AL** | **SECTION: "H"(2)** |

### ORDER AND REASONS

Before the Court are Cross-Motions for Summary Judgment filed by both parties (Plaintiff: Doc. 19, Defendants: Doc. 18). For the following reasons, Defendants' Motion is GRANTED, Plaintiff's Motion is DENIED, and this matter is DISMISSED WITH PREJUDICE.

### BACKGROUND

On July 23, 2008, the M/V TINTOMARA and the barge DM-932 collided on the Mississippi River near New Orleans. The barge DM-932 was carrying a large supply of oil, which spilled into the Mississippi River as a result of the collision. As part of its efforts to contain the spill, the United States Coast Guard closed a portion of the Mississippi River for several days. Plaintiff, Murphy Oil

1

USA, Inc. ("Murphy"), operates an oil refinery and dock downriver from the location where the spill occurred. At the time of the spill, there were several vessels moored to Murphy's dock. Due to the river closure, these vessels were compelled to remain at Murphy's dock for several days. Shortly following the spill, Murphy presented a claim for its alleged damages to the party responsible for the spill. Specifically, Murphy claimed that it sustained damages in the form of cleanup costs associated with oil contamination of the vessels and the dock and damages for lost profits. After receiving no response from the responsible party, Murphy filed a claim for recovery from the National Oil Spill Liability Trust Fund pursuant to 33 U.S.C. § 2702. During the course of the claim process, the United States Coast Guard's National Pollution Funds Center ("NPFC") split Murphy's original claim into two separate claims: (1) a property damage claim; and, (2) a claim for lost profits. The property damage claim was settled. As to the lost profits claim, the NPFC requested additional information from Murphy. Murphy answered this request, and the claim was eventually denied. After the NPFC denied Murphy's request for reconsideration, Murphy filed the instant action seeking judicial review of the administrative action. Currently before the Court are cross-motions for summary judgment. Murphy seeks an order reversing the NPFC's decision and remanding for an award of damages. Defendants seek an order affirming the NPFC's decision and dismissing the suit.

## LEGAL STANDARD

District courts review the final decisions of the NPFC pursuant to the Administrative

Procedure Act, 5 U.S.C. § 701, *et seq* ("APA"). *Buffalo Marine Servs. Inc. v. U.S.*, 663 F.3d 750, 753 (5th Cir. 2011). "The [APA] allows a federal court to overturn an agency's ruling only if it is arbitrary, capricious, an abuse of discretion, not in accordance with law, or unsupported by substantial evidence on the record taken as a whole." *Id*. The Court begins with the "presumption that the agency's decision is valid, and the plaintiff has the burden to overcome that presumption by showing that the decision was erroneous." *Tex. Clinical Labs, Inc. v. Sebelius*, 612 F.3d 771, 775 (5th Cir. 2010). The agency's factual findings will be upheld so long as they are supported by substantial evidence. *Buffalo Marine Servs. Inc.,* 663 F.3d at 753. "The agency's legal conclusions are reviewed de novo, except for questions of statutory interpretation, where the court owes substantial deference to an agency's construction of a statute that it administers." *Id*.

**LAW AND ANALYSIS**

The Oil Pollution Act of 1990 ("OPA") creates a regulatory scheme which governs the cleanup of oil spills. 33 U.S.C. § 2702. Specifically, the OPA creates a system for identifying the party responsible for the oil spill and places certain restrictions on that party's liability. *Buffalo Marine Servs. Inc.*, 663 F.3d at 752. The OPA also sets forth the procedure with which injured parties must comply in order to recover their damages. An injured party must first submit their claim to the party responsible for the oil spill. In the event that the responsible party does not pay the claim, injured parties may submit their claims to the NPFC. The NPFC has promulgated regulations which describe the type of evidence required to make a claim. According to those

regulations, in order for an injured party, i.e. Murphy, to recover on a claim for lost profits, it must show:

> (a) That real or personal property or natural resources have been injured, destroyed, or lost.
>
> (b) That [Murphy's] income was reduced as a consequence of injury to, destruction of, or loss of the property or natural resources, and the amount of that reduction.
>
> (c) The amount of [Murphy's] profits or earnings in comparable periods and during the period when the claimed loss or impairment was suffered, as established by income tax returns, financial statements, and similar documents. In addition, comparative figures for profits or earnings for the same or similar activities outside of the area affected by the incident also must be established.
>
> (d) Whether alternative employment or business was available and undertaken and, if so, the amount of income received. All income that [Murphy] received as a result of the incident must be clearly indicated and any saved overhead and other normal expenses not incurred as a result of the incident must be established.

33 C.F.R. § 136.233.

As will be explained below, Murphy's submission to the NPFC, its response to the NPFC's request for additional information, and its briefing before this Court, reveal a fundamental misunderstanding regarding the type of evidence required to substantiate a claim for lost profits under the OPA. Because Murphy failed to submit the type of evidence require to substantiate its claim, this Court must affirm the decision of the NPFC.

Murphy asserts that it is entitled to $306,921.13 in profits lost as a result of the oil spill. Murphy claims that the five vessels moored to its dock were delayed as a result of the oil spill and

that it was forced to pay demurrage charges as a result. Murphy submitted copies of the charter contracts for the vessels as well as proof that it made timely payments under the contracts.[1] The contracts for the five vessels are, for the purposes of this case, essentially the same. All of the vessels were chartered to Murphy on a long-term basis. Each vessel was chartered by Murphy for a minimum of one year. Several of the vessels were the subject of multiple successive one-year contracts. In order to calculate the purported demurrage charges, Murphy calculated the hourly charter rate for each vessel. This was done by dividing the daily charter rate by 24. Murphy then calculated the number of hours each vessel was required to remain docked due to the oil spill. The hourly charter rate for each vessel was multiplied by the number of hours the vessel was delayed to produce the purported demurrage rate. Curiously, the alleged demurrage rates claimed by Murphy do not appear in the charter contracts for the vessels. Indeed, the charter contracts are devoid of any mention of demurrage. A brief description of the term demurrage is helpful to understanding this discrepancy.

Demurrage is a term commonly found in voyage charters. 2 Thomas J. Schoenbaum, *Admiralty & Mar. Law* § 11-15 (5th ed.). A voyage charter is a contract whereby the charterer purchases the right to use the vessel on a single, specific voyage. *Id*. at § 11-1. Voyage charters generally allow a set period of time for the loading and unloading of the vessel, referred to as laytime. *Id*. at § 11-15. Demurrage charges result when a vessel on a voyage charter exceeds the

---

[1] The evidence differs slightly in that Murphy did not submit the charter contracts for some vessels, or proof of payment for others. However, notwithstanding these minor differences in the type of evidence submitted, the damages claimed by Murphy for each vessel are, for all practical purposes, the same.

allotted laytime.  Thus, demurrage is a charge which is required, pursuant to contract, to be paid to the owner of a vessel when the vessel is delayed beyond the term of the charter.

In light of this explanation, it becomes clear why the charter contracts for the five vessels are silent as to demurrage.  Murphy was not bound to pay demurrage fees to the owners of the vessels.  Indeed, one would not expect demurrage charges to be imposed on the type of charter contracts entered into by Murphy.  Instead, the demurrage charges claimed by Murphy represent an attempt on the part of Murphy to quantify its damages as a result of the oil spill.  Unfortunately for Murphy, this method of damages calculation is not endorsed by the NPFC regulations.  Simply put, payment of demurrage amounts, standing alone, is not sufficient to establish a claim for lost profits.  Stated another way, even accepting Murphy's purported "demurrage rates" as actual expenses, Murphy has still failed to meet its burden to prove lost profits under 33 C.F.R. § 136.233.

Pursuant to 33 C.F.R. § 136.233, Murphy must establish that its "income was reduced as a consequence of" the oil spill.  Next, Murphy must establish "the amount of that reduction."  *Id*. Murphy must then submit evidence from which the NPFC can compare Murphy's profits from similar periods in prior years with Murphy's profits during the period of the oil spill.  33 C.F.R. § 136.233. However, Murphy submitted absolutely no evidence of its income or profits, and the only evidence Murphy submitted from prior years was an accounting of "demurrage rates"  from two previous years.

Herein lies Murphy's misunderstanding of the regulations.  The NPFC regulations permit an injured party to recover "the actual net reduction or loss of earnings or profits suffered."  33 C.F.R.

§ 136.235. Thus, pursuant to the regulations, Murphy's recovery may not be determined by simply calculating increased *expenses* associated with an oil spill. Instead, Murphy must submit evidence to the NPFC from which the NPFC can determine the "net reduction" in Murphy's profits as a result of the oil spill. Because Murphy did not submit the type of evidence which would enable the NPFC to make the calculation required by the regulations, the Court cannot find that the NPFC's decision was arbitrary, capricious, an abuse of discretion, or unsupported by substantial evidence. To the contrary, the Court's review of the record reveals that the NPFC was required to deny Murphy's claim based on the evidence before it.

**CONCLUSION**

For the foregoing reasons, Plaintiff's Motion for Summary Judgment is DENIED, Defendants' Motion for Summary Judgment is GRANTED, and this matter is DISMISSED WITH PREJUDICE.

New Orleans, Louisiana, this 27th day of February, 2014.

JANE TRICHE MILAZZO
UNITED STATES DISTRICT JUDGE